**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Pascal Pakter, et al., | No. CV-18-04559-PHX-JZB |
| Plaintiffs, | **ORDER** |
| v. | |
| Martina Dunne, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 65.) For the reasons discussed below, the Court will grant the motion in part and order specific performance of the contract executed between the parties on November 13, 2018. The Court will also grant summary judgment against Defendant Martina Dunne's counterclaims and dismisses all counterclaims with prejudice. The Court will deny the motion as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

## I.     Background.

On December 7, 2018, Plaintiffs filed their initial complaint. (Doc. 1.) Plaintiffs subsequently amended their complaint on December 11, 2018. (Doc. 5.) In their First Amended Complaint (FAC), Plaintiffs allege three counts: Count One alleges a violation of the Anticybersquatting Consumer Protection Act ("ACPA") 15 U.S.C. § 1125(d); Count Two alleges breach of contract; and Count Three alleges a breach of the implied covenant

of good faith and fair dealing. (Doc. 5 at 5-7.) On March 26, 2019, Plaintiffs voluntarily moved to dismiss Count One of the FAC (doc. 35), and the Court granted Plaintiffs' Motion on April 15, 2019 (doc. 41).

On October 22, 2019, pro se Defendant/Counterclaim Plaintiff Martina Dunne filed her First Amended Answer/Counterclaims. (Doc. 52.) As Defendant, Ms. Dunne alleges ten affirmative defenses barring Plaintiffs' claim for relief: breach of contract, prevention and frustration, good faith by answering defendant, failure to mitigate damages, mistake, lack of capacity, unjust enrichment, unclean hands, no actual injury, and limited or no harm. (*Id.* at 19-22.) As Counterclaim Plaintiff, Ms. Dunne alleges four counterclaims: Counterclaim One alleges "No Bad Faith Intent/Cyberpiracy (15 U.S.C. §§ 1114(2)(D)(v), 1125(d)(1)(B)(ii))" (doc. 52 at 43); Counterclaim Two alleges "Reverse Domain Name Hijacking [(RDNH)] (15 U.S.C. § 1114(2)(D)(iv))" (doc. 52 at 44-46); Counterclaim Three alleges a "Frivolous Action Lawsuit" (*id.* at 46-49); and Counterclaim Four alleges "Intentional Infliction of Emotional Distress [(IIED)]" (*id.* at 50-52.)

On November 5, 2019, Plaintiffs/Counterclaim Defendants filed their answer to Ms. Dunne's First Amended Counterclaim alleging five affirmative defenses: failure to state a claim, unclean hands, estoppel and waiver, barred as to damages equaling or exceeding claims of Plaintiffs, and failure to mitigate damages. (Doc. 55 at 7-8.)

On February 14, 2020, Plaintiffs filed their Motion for Summary Judgment as to their affirmative claims and Defendant's counterclaims. (Doc. 65.) The motion is fully briefed.[1]

## II.   Legal Standard.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if: "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

---

[1] Plaintiffs' Statement of Facts (doc. 66); Defendant's Response (doc. 67); Defendant's Statement of Facts (doc. 68); Plaintiffs' Reply (doc. 76).

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    Plaintiffs' Claims.

The material facts pertaining to the breach of contract claim are not in dispute. Plaintiffs are a married couple residing in the State of California who own and operate a trademarked business called HYPERFLY, "offering educational and entertainment services selling clothing, sports bags, and bottled water." (Doc. 5, ¶¶ 2, 9.) Defendant Maria Dunne is an individual residing in Dublin, Ireland, and is the registrant of the domain name www.hyperfly.com (the "Domain Name"). (*Id.*, ¶ 3; Doc. 52, ¶¶ 3, 22-23.) The Domain Name's registrar is Namecheap, Inc., with its principal place of business in Arizona. (Doc. 5 ¶ 4; Doc. 52, ¶ 4.)

On January 6, 2016, Plaintiff Pascal Pakter reached out to Defendant via e-mail hoping to discuss purchasing the Domain Name from her. (Doc. 52-4 at 1.) After an initial exchange during which Defendant noted she was not actively interested in selling the Domain Name, on August 4, 2017, Plaintiff made an offer to buy the Domain Name for $2,500. (*Id.* at 3.) Defendant declined this initial offer. (*Id.* at 4.) On March 24, 2018, Plaintiff made a second offer for $5,250. (*Id.*) On April 3, 2018, Defendant responded that she had been "approached by a large media company," which made her consider selling "if the price is enough to justify the necessary changes." (*Id.* at 4-5.) Defendant also told

Plaintiff "it would be my preference to see it go to you, but I'm sure you can understand we would sensibly sell to the highest bidder." (*Id.*) Defendant also wrote that she had "not as yet decided on a price" or whether she "may sell on the open market," and she would revert back to Plaintiff "after some consideration." (*Id.* at 5.) The same day Plaintiff replied, in part, "I will continue to yield to your process with the hope that we can soon come to an agreement." (*Id.*)

On November 12, 2018, Defendant wrote to Plaintiff: "I wanted to let you know I have decided to put the hyperfly.com domain on the open market for a minimum of €10,000 Euros. I am happy to sell directly to you at that price if it interests you." (*Id.*) On November 13, 2018, Plaintiff replied, "We of course are interested to purchase and appreciate you offering me first opportunity. Please let me know how we should proceed." (Doc. 66-1, Ex. E; *see also* Doc. 52, ¶ 31.) Defendant alleges she did not see this response. (Doc. 52 ¶ 31.) Plaintiff sent several follow-up e-mails to conclude and finalize the transaction on November 21, 26, and 29, 2018. (Doc. 66-1, Ex. F.) Defendant alleges she did not reply "due to illness." (Doc. 52, ¶¶ 31-32.)

On December 1, 2018, Mr. Porter e-mailed Plaintiff letting him know that Defendant was "unfortunately indisposed" and he was acting on her behalf to sell the Domain Name. (Doc. 52-5 at 1.) Mr. Porter told Plaintiff they had two offers "in excess of €20,000 and would be listing the Domain Name on the open market. (*Id.*) After an e-mail exchange in which Plaintiff threatened legal action, Mr. Porter emailed Plaintiff on December 7, 2018, and stated that Defendant had "recently suffered a significant personal crisis which has rendered her incapacitated" and

> It is now clear that in the midst of my friend's distress she unknowingly sent you what was meant to be a draft email - in error - with an incorrect figure, of which I was unaware until receipt of your email threatening legal action.
>
> In the process of disconnecting from the hosting account in order to host a sales page on flippa.com it appears that correspondences went unseen.
>
> She is aware she made a mistake. . . .

(Doc. 52-5 at 4.) Plaintiffs commenced this action that same day. (Doc. 1.)

### a.    Breach of Contract.

Plaintiff alleges that a contract was formed on November 13, 2018 and that Defendant Dunne is in continued breach of this contract because the Domain Name has not been transferred to their ownership. Plaintiff seeks specific performance of the contract. In order to allege a breach of contract under Arizona law, "a plaintiff must show the existence of a contract, its breach, and resulting damages." *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1185 (D. Ariz. 2019).

### 1.    A Valid Contract Was Formed.

"Under Arizona law, '[f]or an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained.'" *Longnecker v. Am. Exp. Co.*, 23 F. Supp. 3d 1099, 1106 (D. Ariz. 2014) (quoting *Rogus v. Lords*, 804 P.2d 133 (Ariz. Ct. App. 1991)). "The crux of a contract is 'the exchange of promises.'" *11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1014 (D. Ariz. 2017) (quoting *Carroll v. Lee*, 712 P.2d 923, 925 (Ariz. 1986)). "A promise 'may be inferred wholly or partly from conduct.'" *Id.* (quoting *Carroll*, 712 P.2d at 926). "[T]here is no distinction in the effect of the promise whether it is expressed in writing, or orally, or in acts, or partly in one of these ways and partly in others." *Carroll*, 712 P.2d at 926. "The 'ultimate element of contract formation [is] the question whether the parties manifested assent or intent to be bound.'" *11333 Inc.*, 261 F. Supp. 3d at 1014 (quoting *Schade v. Diethrich*, 760 P.2d 1050, 1058 (Ariz. 1988)).

The first issue before the Court is whether a contract was formed to sell the Domain Name.  Plaintiffs assert that Defendant's November 12, 2018 email was an offer, Plaintiffs' November 13, 2018 email response was an acceptance, and thus a contract to purchase the Domain Name for €10,000 was created. Defendant asserts that her e-mail was merely a draft and was sent by mistake. "The requirement of certainty is relevant to the ultimate element of contract formation, i.e., whether the parties manifested assent or intent to be bound." *Rogus*, 804 P.2d at 135. "An offer is '. . . a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that

bargain is invited and will conclude it.'" *K-Line Builders, Inc. v. First Fed. Sav. & Loan Ass'n*, 677 P.2d 1317, 1320 (Ariz. Ct. App. 1983) (quoting Restatement (Second) of Contracts § 24)). "[E]ven though the intentional conduct of a party creates an appearance of assent on his part, he is not responsible for that appearance unless he knows or has reason to know that his conduct may cause the other party to understand that he assents. In effect there must be either intentional or negligent creation of an appearance of assent." Restatement (Second) of Contracts § 19.

### A.   Defendant's November 12, 2018 Email was a Valid Offer.

Here, Defendant does not dispute that she sent an offer to Plaintiff. On November 12, 2018, Plaintiff sent an email stating that she had put the Domain Name "on the open market for a minimum of €10,000 Euros," but that she was "happy to sell directly to [Plaintiffs] at that price if it interests [them]." (Doc. 52-4 at 1.) In her Response, Defendant states that "Defendant mistakenly made an offer of sale to Plaintiffs." (Doc. 67 at 12.)

"An important requirement for a communication to be an offer is that the reader understands that assent by them will conclude the deal." *Kramer v. Creative Compounds LLC*, 2013 WL 6048804, at *4 (D. Ariz. Nov. 15, 2013). "Thus, whether an offer has been made does not depend on the offeree's understanding of the terms of the offer, but instead on whether a reasonable person would understand that an offer has been made and that, upon acceptance, the offeror would be bound." *Ballesteros v. Am. Standard Ins. Co. of Wisconsin*, 248 P.3d 193, 196 (Ariz. 2011) (quoting *Lopez v. Charles Schwab Co.*, 118 Cal. App. 3d 1224, 1230 (2004)). In order for a reasonable person to understand that an offer has been made that only requires assent to conclude the contract, key terms must be specified in the offer, namely, price and quantity. *See Kramer*, 2013 WL 6048804, at *4 (finding an e-mail is not a valid offer when price and quantity information are absent and the e-mail instructs the recipient to contact the offeror for more information).

The email, on its face, would induce a reasonable person to "understand that a proposal of terms was made," that "if accepted, would bind the [offeror] . . . ." *See Ballesteros*, 248 P.3d at 197 (Ariz. 2011). Defendant stated she was willing to sell the

Domain Name, of which there is only one, directly to Plaintiffs for a price of €10,000. The price and quantity, as well as the parties, were clearly defined in her e-mail. *Cf. Kramer*, 2013 WL 6048804, at *4. Upon reading the e-mail, Plaintiffs reasonably understood if they agreed to Defendant's €10,000 amount, the Domain Name would be theirs to own. Accordingly, even if Defendant did not intend to send this email, the Court finds that Defendant's November 12, 2018 email clearly constitutes a valid offer from Defendant to Plaintiffs to sell the Domain Name.

**B.      Plaintiffs' November 13, 2018 Email was a Valid Acceptance.**

Plaintiff's subsequent e-mail on November 13, 2018 was a valid acceptance. "The offer creates a power of acceptance permitting the offeree by accepting the offer to transform the offer as promised into a contractual obligation." *K-Line Builders Inc.*, 677 P.2d at 1320. "An acceptance is '. . . a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Id.* (quoting Restatement (Second) of Contracts § 50)). "An offer cannot be accepted so as to form a contract unless there is sufficient specification of terms so that the obligations involved can be ascertained." *Id.* A promissory acceptance "may be made in words or other symbols of assent, or it may be implied from conduct, other than acts of performance, provided only that it is in a form invited or required by the offer." Restatement (Second) of Contracts § 50. "Acceptance must be unequivocal and 'comply exactly with the requirements of the offer, omitting nothing from the promise or performance requested.'" *Richard E. Lambert, Ltd. v. Houston Const. Co.*, 2009 WL 2031920, at *2 (Ariz. Ct. App. July 14, 2009) (quoting *Clark v. Campania Ganadera de Cananea, S.A.*, 384 P.2d 691, 697 (Ariz. 1963)).

Here, the record plainly shows that Plaintiffs accepted Defendant's valid offer on November 13, 2018. It is uncontested that Defendant's November 12, 2018 email contained sufficient specification of terms, including identification of the Domain Name to be sold, the requested price, and a manifestation of willingness to sell the Domain Name to Plaintiffs in exchange for the requested price. It is also undisputed that Plaintiffs responded

to Defendant's offer within one day of it being made, accepting the offer, and asking Defendant how she wanted to proceed. What is more, Plaintiffs reiterated their acceptance of Defendant's offer numerous times over the coming weeks, repeatedly pursuing Defendant's instruction on how to finalize the deal and exchange consideration.[2] The Court finds that the undisputed facts show Plaintiffs' acceptance was "unequivocal" and complied exactly with Defendant Dunne's offer, rendering it legally valid.[3]

### C. Effect of Defendant's Purported Mistake.

Defendant argues that, even if the offer and acceptance are otherwise valid, the Court should still set aside the agreement between the parties because Defendant sent the November 12, 2018 offer by mistake. Specifically, Defendant argues that the November 12, 2018 email was a draft email that was never intended to be sent to Plaintiffs. Defendant's argument is not persuasive. Because Defendant's purported mistake in sending the e-mail was unilateral, it does not excuse performance of the contract.

"A unilateral mistake that has a material effect on the agreed exchange of performances and that is adverse to the mistaken party renders a contract voidable if the mistaken party does not bear the risk of the mistake and the other party had reason to know of the mistake or that party's fault caused the mistake." *United States v. Talley Def. Sys.,*

---

[2] *See* Doc. 66-1, Exs. E-F, at 46-48 (November 21 and 26, 2018 e-mails in which Plaintiff Pascal Pakter states: "Since your last email offering us the opportunity to purchase the domain and my subsequent replies, I have not heard back. I have also make [sic] several call and left voice mails. After I received your initial offering directly to me I immediately replied and have shown good faith throughout the years. . . ."; November 29, 2018 email in which Plaintiff Pascal Pakter states: "I have made several attempts to call and email you in regard to your offer which I had accepted. As you are well aware, I have been interested in this domain for several years and made that abundantly clear to you. When you offered me the domain for 10,000 Euro of which I asked to finalize the transaction you ignored all of my attempts to do so. Again, I asking [sic] you to please respond so that we can finalize the transaction. Please send me your banking details and I will make an immediate wire transfer for the full amount you offered for 10,000 Euro. . . .").

[3] The Court notes that the November 12 and November 13, 2018 emails follow a series of previous emails between the parties. On August 9, 2017, Defendant expressly declined an offer to buy the domain. (Doc. 66-1 at 42.) On March 24, 2018, Plaintiff sent a subsequent offer of "$5250" that Defendant, on April 3, 2018, agreed to consider. (*Id.*) In response to these emails, Defendant emailed Plaintiff on November 12, 2018 with the €10,000 offer. In light of these previous negotiations, it was reasonable for Plaintiff to believe that Defendant was willing to make the sale at the higher price, and for Plaintiff to accept Defendant's offer.

1    *Inc.*, 393 F. Supp. 2d 964, 972 (D. Ariz. 2005) (citing Restatement (Second) of Contracts

2    § 153)). A contract is also voidable based on the mistake of one party if "the effect of the

3    mistake is such that enforcement of the contract would be unconscionable" and "the

4    mistaken party bears the substantial burden of establishing unconscionability."

5    Restatement (Second) of Contracts § 153.

6        Here, Defendant had no reason to know that Plaintiff was mistaken. Her e-mail was

7    clear and unambiguous—she intended to sell the Domain Name for a *minimum* of €10,000.

8    In his prior outreach to Defendant, Plaintiff had offered her lower sums of money, which

9    she had not accepted. Defendant's statement that €10,000 was the lowest price at which

10   she was willing to sell the Domain Name would seem to be directly in line with the

11   negotiations that had occurred prior to that point – it was almost double Plaintiff's last

12   offer. Defendant does not allege that Plaintiff was aware of her mistake prior to his

13   acceptance of her offer, in fact, she only alleges he was first made aware of her mistake

14   when her representative Mr. Porter e-mailed Plaintiff weeks later. (Doc. 52-5.) Defendant

15   "was the only party in a position to know if a mistake were made, and so [she] bears the

16   risk of mistake." *Talley*, 383 F. Supp. 2d at 972. Defendant also does not meet her burden

17   to establish that enforcement of such an agreement would be unconscionable.[4] In her e-

18   mail, she wrote that she unequivocally would be willing to sell the Domain Name for a

19   price of €10,000. (Doc. 52-4.) Thus, a valid, enforceable contract was formed between the

20   two parties on November 13, 2018, to sell the Domain Name for €10,000.

21        **2.    Breach and Damages.**

22        Plaintiffs seek specific performance of the contract due to Defendant's continued

---

23   [4] Defendant offers certain medical records documenting her treatment for mental illness.
24   (Docs. 70-1-70-3). A contract is voidable by reason of mental illness or defect if a person
     "is unable to understand in a reasonable manner the nature and consequences of the
25   transaction," or "is unable to act in a reasonable manner in relations to the transaction and
     the other party has reason to know of his condition." Restatement (Second) of Contracts §
26   15. "Where there has been no previous adjudication of incompetency, the burden of proof
     is on the party asserting incompetency." *Id.*; *see also Phillips v. United States*, 2018 WL
27   6920463, at *4 (D. Ariz. Dec. 10, 2018) (defendant did not meet his burden to establish
     incompetency at the time he entered into the contract at issue). While Defendant's medical
28   records establish her history of treatment for certain conditions, they do not meet the burden
     of establishing her incompetency and inability to understand "the nature and consequences
     of the transaction."

refusal to transfer the Domain Name under the contract. "A party breaches a contract when it 'fails, without legal excuse, to perform any promise which forms the whole or part of a contract.'" *IOW, LLC*, 425 F. Supp. at 1185 (quoting *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986)). As discussed above, it is undisputed that Defendant Dunne has not transferred the Domain Name to Plaintiffs. Defendant has not established a legal excuse for not performing under the contract, therefore, she is in breach.

"Generally, three remedies are available for a breach of contract: rescission, continued performance, or termination and damages." *Cty. of La Paz v. Yakima Compost Co.*, 233 P.3d 1169, 1189 (Ariz. Ct. App. 2010) (citing *W. Pinal Family Health Ctr., Inc. v. McBryde,* 785 P.2d 66, 68 (Ariz. Ct. App.1989)). "The court will not order specific performance if damages would adequately protect the nonbreaching party's expectation interest." *Id.* (citing Restatement (Second) of Contracts § 359(1)).

> For an order of specific performance to be granted, the following requirements must be met: (1) there must be a contract; (2) the terms of that contract must be certain and fair; (3) the party seeking specific performance must not have acted inequitably; (4) specific enforcement must not inflict hardship on the other party or public that outweighs the anticipated benefit to the party seeking specific performance; and (5) there must be no adequate remedy at law.

*Employers Mut. Cas. Co. v. B5 Inc.*, 2015 WL 7451150, at *4 (D. Ariz. Nov. 23, 2015) (citing *How v. Fulkerson*, 528 P.2d 853, 855 (Ariz. Ct. App. 1975)). The principal factors in determining whether damages would be adequate are: "(a) the difficulty of proving damages with reasonable certainty, (b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected." Restatement (Second) of Contracts § 360. "If goods are unique in kind, quality or personal association," such as patents or copyrights, "the purchase of an equivalent elsewhere may be impracticable, and the buyer's inability to cover is strong evidence of' the propriety of granting specific performance." *Id.* Comment C.

Here, there is a contract, the terms of that contract are certain and fair, Plaintiffs have not acted inequitably, and ordering specific performance would not inflict hardship on Defendant, as Defendant will receive the price she agreed to at the time she entered into the contract. There is no adequate remedy available at law. The subject of the contract is a domain name that has the unique characteristic of matching Plaintiffs' trademarked business name, which is what makes it valuable to them and their business. This is a good that is unique "in kind, quality, [and] personal association." Restatement (Second) of Contracts § 360 Comment C. Damages would not provide an adequate remedy to compensate Plaintiffs for their expectation interest as there is no "suitable substitute" domain name that would provide the same value as the Domain Name itself. Therefore, specific performance is warranted, and Defendant must transfer the Domain Name to Plaintiffs.

### b.     Implied Covenant of Good Faith and Fair Dealing.

In their Motion, Plaintiffs state that they "are entitled to summary judgment on their affirmative claims" (doc. 65 at 5); however, Plaintiffs include no argument directly addressing their Count Three claim for Breach of Implied Covenant of Good Faith and Fair Dealing. (*See id.* at 1-11.) To the extent Plaintiffs do seek summary judgment on Count Three, the Court will deny Plaintiff's Motion.

"Under Arizona law, every contract 'implies a covenant of good faith and fair dealing.'" *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1187 (D. Ariz. 2019) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986)). "The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings*, 726 P.2d at 569. "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty." Restatement (Second) of Contracts § 205. "Thus, Arizona law recognizes that a party can breach the implied covenant of good faith and fair

dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Two Bros. Distrib. Inc. v. Valero Mktg. and Supply Co.*, 270 F.Supp.3d 1112, 1128 (D. Ariz. 2017) (quoting *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 435 (2002)).

"Whether a party has breached the covenant of good faith and fair dealing is a question of fact." *BMW of N. Am., LLC v. Mini Works, LLC*, 166 F. Supp. 3d 976, 985 (D. Ariz. 2010) (quoting *Maleki v. Desert Palms Prof'l Props., L.L.C.*, 214 P.3d 415, 421 (Ariz. Ct. App. 2009)). "The relevant inquiry always will focus on the contract itself, to determine what the parties did agree to." *Id.*

> Notwithstanding the difficulty in devising a rule of all-encompassing generality, a few principles have emerged in the decisions. To begin with, breach of a specific provision of the contract is not a necessary prerequisite. . . . Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive.

*Olyaie v. Gen. Elec. Capital Bus. Asset Funding Corp.*, 217 F. App'x 606, 612 (9th Cir. 2007) (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 726-27 (Cal. 1992)).

> The good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming a breach.

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 30 (Ariz. 2002) (quoting *Sw. Savs. & Loan Assoc.* v. *SunAmp Sys., Inc.*, 838 P.2d 1314, 1319 (Ariz. Ct. App. 1992)).

Here, Plaintiffs argue "they have been damaged by the value of not having the Domain Name reflecting their registered trademark from the time Ms. Dunne refused to transfer the Domain Name until the date the Domain Name is transferred." (*See* Doc. 65 at

6.) The relevant inquiry is whether Defendant's behavior was "objectively unreasonable," regardless of her intentions. *Olyaie*, 217 Fed. App'x at 612. Taking all reasonable inferences in favor of Defendant, under her allegations, she sent a mistaken e-mail on November 12, 2018, offering to sell the Domain Name, and in the process of putting the Domain Name on the open market, no longer checked her e-mail account after that day. Instead, several weeks later, Defendant, through her representative, attempted to renegotiate the terms to receive double the amount she had bargained for and attempted to sell the Domain Name on the open market to other buyers. Defendant has raised a genuine issue of material fact as to whether her behavior was objectively unreasonable given her interactions with Plaintiffs. While the initial mistake and unseen e-mails on their own do not constitute objectively unreasonable behavior, the subsequent attempts to extract a higher price through threats of selling the Domain Name on the open market would "impair the right" of Plaintiffs to receive the benefits they bargained for under the initial contract.

Accordingly, the Court finds that a genuine issue of material fact as to whether Defendant breached the implied covenant of good faith and fair dealing and will deny Plaintiffs' Motion for Summary Judgment on this claim.

## IV. Defendant's Counterclaims.

### a. ACPA Counterclaims are Moot.

Defendant's first two counterclaims based on Plaintiff's allegations regarding a violation of the ACPA are moot. Defendant seeks a declaratory judgment stating she lacked the bad faith intent as required by the ACPA statute in order to constitute a violation, and she seeks actual/statutory damages and attorney's fees based on this declaratory judgment. (Doc. 52 at 43.) Defendant's claims are based on the allegations that Plaintiff is knowingly misrepresenting "that the hyperfly.com domain name is a bad faith use of a valid trademark" and that the Domain Name was "registered with a specific intent to profit from Plaintiff's Name" under the ACPA. (*Id.* at 43-44.) Plaintiffs, however, voluntarily dismissed any claims under the ACPA and only allege that Defendant is breaching a contract to sell the Domain Name. (Docs. 35, 41.) Therefore, any harm Defendant alleges

1   regarding misrepresentations under the ACPA by the Plaintiffs is no longer present, and

2   the claims are moot. "No justiciable controversy is presented where the question sought to

3   be adjudicated has been mooted by developments subsequent to filing of the complaint."

4   *M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 857 (9th Cir. 2014).

5          Defendant also alleges that Plaintiffs have caused the "locking and/or suspension"

6   of the Domain Name by the registrar and this constitutes "Reverse Domain Name

7   Hijacking." (Doc. 52 at 44.)

8          To prevail on a claim for reverse domain name hijacking, a plaintiff: "must
       show (1) registration of a domain name; (2) that has been 'suspended,
9      disabled, or transferred under a policy implemented by a registrar as
       described in 15 U.S.C. § 1114(2)(D)(ii)(II);' (3) 'that the owner of the mark
10     that prompted the domain name to be suspended, disabled, or transferred has
       notice of the action;' and (4) 'that [the plaintiff's] registration or use of the
11     domain name is not unlawful.'"

12  *Dent v. Lotto Sport Italia SpA*, 2020 WL 1170840, at *5 (D. Ariz. Mar. 11, 2020) (quoting

13  *AIRFX.com v. AIRFX LLC*, 2012 WL 3638721, at *6 (D. Ariz. Aug. 24, 2012)). Under the

14  ACPA,

15         A domain name registrant whose domain name has been suspended,
       disabled, or transferred under a policy described under clause (ii)(II) may,
16     upon notice to the mark owner, file a civil action to establish that the
       registration or use of the domain name by such registrant is not unlawful
17     under this chapter. The court may grant injunctive relief to the domain name
       registrant, including the reactivation of the domain name or transfer of the
18     domain name to the domain name registrant.

19

20  15 U.S.C.A. § 1114(2)(D)(v). While Defendant may meet the standard set forth in the act,

21  because Plaintiffs have not proven her registration was unlawful under the ACPA, her

22  actions, as discussed above, breached a valid contract. Even if Defendant were entitled to

23  injunctive relief as the registrant to unlocking the Domain Name under the ACPA, it is

24  negated by her breach of contract for sale of the Domain Name. As of November 13, 2018,

25  Plaintiffs had a right to transfer of the Domain Name and so Defendant is not harmed by

26  the locking of the Domain Name after that point. Thus, any injunction ordering the registrar

27  to unlock the Domain would be accompanied by an injunction to immediately transfer the

28

1   Domain Name to Plaintiffs, and Defendant is not entitled to relief under either ACPA

2   claim.

3          **b.      Frivolous Action Counterclaim Fails as a Matter of Law.**

4          Defendant's Counterclaim Three fails as Plaintiffs have brought a meritorious

5   action in this Court. Defendant alleges that Plaintiffs brought a "vexatious and frivolous"

6   lawsuit based on their ACPA claim. (Doc. 52 at 46.)  "To prove wrongful institution of

7   civil proceedings, [Plaintiff] must demonstrate Defendants (1) instituted a civil action, (2)

8   motivated by malice, (3) begun or maintained without probable cause, and which (4)

9   terminated in his favor and (5) damaged him." *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091,

10  1132 (D. Ariz. 2013). Here, Plaintiffs had probable cause to institute a civil action. Based

11  on their prior dealings with Defendant, they had probable cause to believe a contract had

12  been formed for the sale of the Domain Name and brought an action to enforce that

13  contract. As discussed above, their additional claim for violation of the ACPA was

14  voluntarily dismissed, therefore, any arguments that this claim damaged Plaintiff through

15  malicious prosecution cannot be maintained as it was not pursued beyond the initial

16  complaint stage. And, because the breach of contract claim is resolved in Plaintiffs' favor,

17  as discussed above, Defendant does not meet the elements required to bring a wrongful

18  institution of civil proceedings claim.

19         Similarly, any potential claims for abuse of process cannot stand. "The elements of

20  an abuse of process claim are '(1) a willful act in the use of judicial process, (2) for an

21  ulterior purpose not proper in the regular conduct of the proceedings.'"  *Denogean v. San*

22  *Tan Behavioral Health Servs. LLC*, 2017 WL 4922035, at *2 (D. Ariz. Oct. 31, 2017)

23  (quoting *Cruz v. City of Tucson*, 401 P.3d 1018, 1021 (Ariz. Ct. App. 2017)). "Plaintiff's

24  motive for filing the complaint, even if improper, cannot support an abuse of process claim

25  because 'abuse of process requires some act beyond the initiation of a lawsuit.'" *Id.*

26  (quoting *Joseph v. Markowitz*, 551 P.2d 571, 575 (Ariz. Ct. App. 1976)). "Abuse of process

27  'is not commencing an action or causing process to issue without justification, but

28  misusing, or misapplying process justified in itself for an end other than that which it was

1
2
3
4
5
6

designed to accomplish.'" *Id.* (quoting *Joseph*, 551 P.2d at 574). Additionally, "Plaintiff's 'mere persistence in this litigation, even if based on an improper motive, does not sustain the tort.'" *Id.* (quoting *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 888 (Ariz. Ct. App. 2004)). Defendant does not make any allegations beyond Plaintiffs' commencement of this action, therefore, Defendant's claims for wrongful initiation of civil proceedings and/or abuse of process fails as a matter of law.

7
8

  **c. Intentional Infliction of Emotional Distress is Barred by the Litigation Privilege.**

9
10
11
12
13
14
15
16

  Defendant's Counterclaim Four also fails because Defendant does not allege the requisite conduct required to state a claim for intentional infliction of emotional distress. Under Arizona law, to recover for intentional infliction of emotional distress, "[t]he three required elements are: *first*, the conduct by the defendant must be "extreme" and "outrageous"; *second*, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third*, severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987).

17
18

  The standard of "outrageousness" followed by the Arizona courts is that set forth in comment d to Restatement § 46, *Ford*, 153 Ariz. at 43, 734 P.2d at 585, which provides that

19
20
21
22
23

  "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

24

*Adiutori v. Sky Harbor Int'l Airport*, 880 F. Supp. 696, 707 (D. Ariz. 1995).

25
26
27
28

  The Arizona courts have made it clear that the "conduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct[,]" . . . and that it is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. . . . Summary judgment is thus appropriate if the conduct at issue is not sufficiently outrageous.

*Id.* (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980) and citing *Rowland v. Union Hills Country Club*, 757 P.2d 105, 108 (Ariz. App.1988)).

The crux of Defendant's claim seems to lie in Plaintiff's e-mails threatening and then taking said legal action by filing a lawsuit to enforce the purported contract. (Doc. 52 at 50; Doc. 52-5 at 2-3). Under Arizona law, "[a]ny claim for intentional infliction of emotional distress based on actions occurring during the course of litigation is barred by the litigation privilege." *Lory v. Fed. Ins. Co.*, 122 F. App'x 314, 318 (9th Cir. 2005). "The privilege protects judges, parties, lawyers, witnesses, and jurors." *Id.* (quoting *Green Acres Trust v. London*, 688 P.2d 617, 621 (Ariz. 1984)). Defendant is barred from any claims regarding behavior or conduct in relation to Plaintiff's institution of this action.

In any event, Defendant has not alleged that Plaintiffs' behavior reached levels that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Adiutori*, 880 F. Supp. at 707. Plaintiff Pascal Pakter threatened to pursue legal action unless the act he felt was mandated under the contract was performed. This is not the type of behavior that is "at the very extreme edge of the spectrum of possible conduct," nor if recited to the average member of the community, "would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Adiutori*, 880 F. Supp. at 707; *Rowland*, 757 P.2d at 108. Because Defendant has failed to allege any conduct meeting the first element of the claim, Defendant's claim for intentional infliction of emotional distress fails.

**V.     Conclusion.**

In sum, the Court will grant Plaintiffs' Motion for Summary Judgment (doc. 65) on Plaintiffs' claim for breach of contract and will dismiss each of Defendants' Counterclaims. The Court will order specific performance of the contract and direct the Defendant to effectuate the transfer of the Domain Name to Plaintiffs for the agreed-upon sum of €10,000. The Court will deny the Motion for Summary Judgment as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

**IT IS ORDERED:**

1.      Plaintiffs' Motion for Summary Judgment (doc. 65) is **granted in part**.

2.      The Clerk is directed to enter judgment for Plaintiffs, and against Defendant, on Count Two of Plaintiff's Amended Complaint (doc. 5) and all counts of Defendant's counterclaims (doc. 52).

3.      Plaintiff is **awarded** specific performance of the agreement. The parties will notify the Domain Name registrar, Namecheap, Inc.[5], of the Court's decision **within 30 days** of this Order. Once the Domain Name is released, Defendant is ordered to transfer the Domain Name to Plaintiffs immediately. Plaintiffs will immediately transfer the €10,000 price to Defendant.

4.      The Motion for Summary Judgment (doc. 65) is **denied** as to Count Three of Plaintiff's FAC.

Dated this 8th day of June, 2020.

Honorable John Z. Boyle
United States Magistrate Judge

---

[5] (Doc. 5, ¶4; Doc. 52, ¶4.)